UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

UNITED STATES OF AMERICA,

        v.

SHAROD LIBURD,

              Defendant.

--------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
25-CR-55 (WFK)

**WILLIAM F. KUNTZ, II, United States District Judge:**

On June 18, 2025, Sharod Liburd ("Defendant") pled guilty to one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Plea Agreement (the "Plea") ¶ 1, ECF No. 47; Indictment ¶ 2, ECF No. 15.[1] The Court now sentences Defendant and provides a complete statement of reasons, under 18 U.S.C. § 3553(c), of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons set forth below, Defendant is hereby sentenced to forty-one (41) months' incarceration; two (2) years of supervised release with both the standard and special conditions of supervision; forfeiture of items identified in the preliminary Order of Forfeiture, ECF No. 51; and a $100.00 mandatory special assessment.

## I.  Background

### A. Factual Background

This case revolves around Defendant's prior conviction in the Eastern District of New York and his actions while serving the resulting sentence. On January 14, 2020, Defendant was sentenced by District Judge Pamela K. Chen to a total of eighty-seven months' incarceration to be followed by three years of supervised release for Hobbs Act robbery, Hobbs Act robbery conspiracy, and possessing and brandishing a firearm during a crime of violence. *See* Presentence Investigation Report (the "PSR") ¶¶ 4, 33, ECF No. 69; *see also* Add. to PSR at 1, ECF No. 77 (correcting Defendant's conviction as to Count 11).

On June 15, 2023, the Metropolitan Detention Center, Brooklyn (the "MDC") facilitated Defendant's transfer to a Residential Reentry Management Center (the "RRM"). *See* PSR ¶ 4.

---

[1] Citations are to the docket in *United States v. Liburd*, 25-CR-55. Page pincites refer to the ECF page numbers assigned to a filing where available, and where no ECF heading is present, to the page numbers listed in the original filing.

While on home confinement through the RRM on December 2, 2023, "the RRM was alerted that [Defendant] was out of bounds and was at a motel." *Id.* Defendant "was immediately placed on escape status[]" because "[he] failed to answer telephone calls and pings sent by the RRM to [his] ankle monitor[.]" *Id.* The next day, "[Defendant]'s ankle monitor ceased receiving or transmitting pings and was no longer able to be traced." *Id.*

### B. Procedural History

#### 1. *Arrest and Indictment*

On December 18, 2023, the Government filed a complaint (the "First Complaint") and application for an arrest warrant, *see* First Compl., ECF No. 1, which was issued the same day by Magistrate Judge Robert M. Levy (the "First Arrest Warrant"). *See* First Arrest Warrant, ECF No. 2.

On October 1, 2024, New York City Police Department (the "NYPD") and Federal Bureau of Investigation officials executed the First Arrest Warrant at an apartment in Brooklyn, New York, "where [Defendant] was believed to be residing." PSR ¶ 5; *see also* Add. to PSR at 2 ("Law enforcement officers obtained IP address records from a Facebook account associated with [Defendant]" which "connected to this apartment's IP address on numerous occasions since July 29, 2024.").

As the officials "approached [the] apartment" and "knocked on the door to [the] residence, additional law enforcement members witnessed a firearm, specifically, a .9mm KelTec pistol bearing serial number RDA62, being thrown from the residence's back window." PSR ¶ 5. Upon his arrest at this residence and after being read his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), "[Defendant] admitted that he threw the firearm out of the residence's window after law enforcement knocked on the front door." *Id.*

On October 3, 2024, the Government filed a second complaint and application for an arrest warrant, alleging police officers arrested Defendant on the First Complaint and found him in possession of a firearm and ammunition. *See* Second Compl., ECF No. 1. Magistrate Judge Marcia M. Henry issued the second arrest warrant the same day. *See* Second Arrest Warrant, ECF No. 2

On February 11, 2025, a U.S. Grand Jury returned a two-count indictment against Defendant, charging him with the following: Count One alleged escape from custody, in violation of 18 U.S.C. § 751(a); and Count Two alleged he was a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). *See* Indictment, ¶¶ 1–2. The indictment also alleged criminal forfeiture as to Count Two. *See id.* ¶ 3.

On February 14, 2025, Magistrate Judge James R. Cho arraigned Defendant on the indictment. ECF No. 18. Defendant pled not guilty to both counts and Magistrate Judge Cho continued his detention pending trial. *Id.*

### 2.    *Change-of-Plea and Agreement*

On February 18, 2025, this Court scheduled an initial status conference for March 13, 2025. ECF No. 20. On March 12, 2025, defense counsel filed a consent motion to adjourn the status conference and instead schedule a change-of-plea hearing. ECF No. 24. The Court granted the motion the same day and adjourned the next proceeding to April 11, 2025. ECF No. 25.

On April 9, 2025, defense counsel informed this Court Defendant no longer wished to plead guilty at the above-mentioned proceeding. ECF No. 30. On April 11, 2025, the Court held the status conference, during which the parties requested a trial date and a pretrial motion schedule. On April 14, 2025, the Court scheduled another status conference for June 18, 2025,

and directed the parties to file a joint pretrial briefing schedule and proposed trial dates. ECF No. 33.

On April 17, 2025, the Court granted the parties' proposed trial dates and corresponding briefing schedules, ECF No. 36, and scheduled a jury trial to commence on December 1, 2025. ECF No. 37.

On June 11, 2025, defense counsel again submitted a motion to convert the scheduled status conference to a change-of-plea hearing. ECF No. 43. The Court granted the motion the same day. ECF No. 44. On June 18, 2025, this Court held the above-mentioned change-of-plea hearing, during which Defendant pled guilty to Count Two of the indictment pursuant to a written plea agreement. *See* Plea ¶ 1; *see also* Indictment ¶ 2.

Pursuant to the Plea, Defendant agreed not to file an appeal or otherwise challenge his sentence if the Court imposes a term of sixty-three months' incarceration or below. Plea ¶ 5. The Government further agreed "no further criminal charges [would] be brought against [Defendant] for" the criminal activity catalogued in both counts of the indictment. *Id.* ¶ 6(a). Additionally, the Government agreed to "make no motion for an upward departure under the Sentencing Guidelines." *Id.* ¶ 6(b).

In the Plea, the parties further agreed to criminal forfeiture of various firearm paraphernalia (the "Seized Firearm and Ammunition"). *See id.* ¶¶ 1(g), 7. On July 11, 2025, the Government filed a motion to enter a preliminary Order of Forfeiture, ECF No. 50, where "[Defendant] has consented to the forfeiture of all right, title, and interest to the United States in the" Seized Firearm and Ammunition "all seized by law enforcement on or about October 1, 2024, in Brooklyn, New York[.]" Ord. of Forfeiture at 1. This Court granted the motion the same day. *See id.*

4

## II.    Legal Standard

Congress set forth the procedures for imposing a sentence in a criminal case in 18 U.S.C. § 3553.  Together with 18 U.S.C. § 3553, the Guidelines operate as the "starting point and . . . initial benchmark" for a court evaluating a criminal sentence.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  If and when a trial court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state, in open court, the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines.  18 U.S.C. § 3553(c)(2).  The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form."  *Id.*  The court's statement of reasons "shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)."  *United States v. Davis*, 08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal citation omitted).

When determining the appropriate sentence, the Court must consider seven different factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the U.S. Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense.  *See* 18 U.S.C. § 3553(a).  The Court now addresses each factor in turn.

## III.  Analysis

### A. The Nature and Circumstances of the Offense and the History and Characteristics of Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant[.]"  18 U.S.C. § 3553(a)(1).

### 1.  *Family and Personal Background*

Defendant was born on August 27, 1997, in Brooklyn, New York, to his father, Sharod Alford, and mother, Khalileha Liburd.  *See* PSR ¶ 43.  Defendant has one full biological sister: Shalieha Alford.  *See id.* ¶ 44.  Additionally, he has three paternal half-siblings and three maternal half-siblings: Mirah Liburd, Quanesha Bowman, Layla Alford, Yhanique Ebehart, Ayhana Ebehart, Leyhana Ebehart, and Melaae McCain.  *See id.*; *see also* Add to PSR at 6 (correcting Melaae's name as reported in the PSR).

Defendant reports "ha[ving] an overall 'rough' childhood, as he was the only male in his family after his father abandoned them when [Defendant] was young."  PSR ¶ 46.  Specifically, "[his] father was incarcerated for shooting another individual[]" when Defendant was "between the ages of six and [twelve][.]"[2]  *Id.*  "[W]hen [Defendant] turned 18 years of age, [he and his father] started to rebuild their relationship."  *Id.* ¶ 43.  Defendant "does not speak to his father regularly[.]"  *Id.*

Defendant's father is now fifty years of age and married to Chasity Santiago, who is forty-six years of age.  *See id.*  "[Chasity] resides in Orlando, Florida, with [Defendant]'s father . . . and is employed as a school bus driver."  *Id.*  Defendant "shares a good relationship with his stepmother, who is aware of his current legal situation and supportive of him."  *Id.*

---

[2] Per Defendant's prior federal presentence investigation report, his father was sentenced to six years of incarceration for assault in the first degree.  PSR ¶ 46 n.2.  On July 9, 2001, he was released to parole and his parole term has since expired.  *Id.*

6

"[Defendant] was primarily raised by his mother under below-average economic circumstances." *Id.* ¶ 46. "[Defendant] and his family . . . moved to Syracuse, New York[,]" after "[h]is mother entered into a relationship with another individual, who fathered [Defendant]'s sister," Melaae McCain. *Id.*; *see also* Add. to PSR at 6. The individual with whom Defendant's mother entered into a relationship "frequently physically abused [Defendant's] mother when [Defendant] was between seven and [eleven] years of age[]" and frequently did so "in front of [Defendant][,]" who "described witnessing the physical abuse as 'hurtful,' as he could not stop it because he was too young." PSR ¶ 46. Defendant's mother called law enforcement on multiple occasions due to the abuse, but because "[his] mother was not employed at that time, they were relying solely on" that individual's income. *Id.* Furthermore, both Defendant's mother and this individual "abuse[d] marijuana and alcohol." *Id.*

The relationship between Defendant's mother and Melaae's father ended in 2005, and "[Defendant and his mother] moved back to Brooklyn, New York." *Id.* However, "[d]ue to the financial struggles that [Defendant's] mother faced when they returned to Brooklyn, she would often leave [him] and his siblings with [his] maternal grandmother while his mother slept in various shelters." *Id.*

In 2011, they moved once more to an apartment in Brooklyn, New York, where his mother resides today. According to the PSR, Defendant's mother "has been hospitalized and in a coma[]" since April 2025. *Id.* ¶¶ 43, 46. His mother's current medical condition "was caused by a heart attack she experienced after [Defendant]'s sister[,]" Shalieha Alford, "passed away[.]" *Id.* ¶ 43. "Shalieha . . . was fatally shot on April 16, 2025, at the age of 30." *Id.* ¶ 44. On "[t]he day [Shalieha] was buried, [Defendant's] mother was transported to the hospital because she could not breathe, went into cardiac arrest, and has been in a coma and on a ventilator since." *Id.*

¶ 45. "[P]rior to the coma, [Defendant's] mother had multiple health problems that were amplified during the COVID-19 pandemic[,]" but "his mother has been progressing slowly." *Id.* ¶ 43. At forty-nine years of age, his mother is primarily cared for by his sister Yhanique. *See id.* ¶¶ 43, 45.

At his sentencing hearing, Defendant reported being married.[3]

In addition to the above, the Court has considered the letters from Defendant's aunt, sisters, and cousin, which were submitted on his behalf, and the observations of his childhood and family life recounted in the mitigation report prepared by Ms. Lisa Orloff, LMSW, ACSW. *See* Def.'s Sent'g Mem., Ex. C, ECF No. 72; *see also* Def.'s Second Sent'g Mem. Supp., ECF No. 79; *see also* Def.'s Mot. to Seal ("Def.'s Ex. B"), ECF No. 73.

### 2.     *Educational and Employment History*

Defendant attended Jim Thorpe School in Brooklyn, New York. *See* PSR ¶ 64. Defendant "ceased his attendance when he was in 10th grade because he was arrested for a prior offense." *Id.* Defendant's educational records reflect "[he] had an individualized education [plan] due to emotional disturbance[,]" and "a history of poor attendance and excessive absences, which contributed to his performance at a lower grade level." *Id.* "After leaving Jim Thorpe School, [Defendant] never resumed his formal education, enrolled in a vocational training program, or developed any special skills." *Id.* ¶ 65.

Defendant's only record of employment was as a part-time installer/laborer at Finest Windows from 2016 to 2017. *See id.* ¶ 68. Defendant reported "earning approximately $700[.00] per week[,]" but "resigned for 'no good reason[.]'" *Id.* However, Defendant's prior federal presentence investigation report "reflects that [he] quit after an altercation with his

---

[3] The PSR indicated Defendant was "currently single, has never been married, and has no children." PSR ¶ 47.

supervisor." *Id.* "Prior to 2016, [Defendant] was either incarcerated or financially supported by his mother, other family members or friends, or through his receipt of United States Government benefits (Supplemental Security Income, or SSI)." *Id.* ¶ 69.

After reviewing Defendant's financial position, the U.S. Probation Office ("Probation") concludes "he appears unable to pay a fine." *Id.* ¶ 74.

        3.        *Prior Convictions*

Defendant has three criminal convictions and three arrests prior to the instant case. *See id.* ¶¶ 31–41. On May 25, 2011, the Kings County Family Court convicted Defendant of robbery in the second degree, a juvenile delinquency. *See id.* ¶ 31. Defendant was sentenced to eighteen months of probation. *See id.*

On January 23, 2014, the Kings County Supreme Court sentenced Defendant for attempted criminal possession of a weapon in the second degree, a Class D felony. *See id.* ¶ 32. Defendant was sentenced to one year of incarceration. *See id.*

On November 23, 2015, Defendant was arrested and charged with criminal trespass in the third degree and unlawful possession of marijuana. *See id.* ¶ 39. On January 4, 2016, the Kings County Criminal Court issued a bench warrant which was later returned on April 15, 2017, and the case was adjourned in contemplation of dismissal. *See id.*

On May 24, 2017, Defendant was arrested following a traffic stop where, "[d]uring a search of the vehicle, law enforcement recovered a Smith & Wesson .380 caliber semi-automatic pistol, a Rock Island Armory .38 caliber revolver with a defaced serial number, and two necklaces." *Id.* ¶ 33. "[Defendant], along with his co-conspirators, [had] approached an individual in Queens, New York, brandished a firearm, and demanded money from the individual." *Id.* Prior to the traffic stop, they stole "$1,000[.00] in cash and two gold necklaces"

from the individual. *Id.* As previously mentioned, District Judge Chen sentenced Defendant "to three months of incarceration on both" Hobbs Act robbery conspiracy and substantive Hobbs Act robbery, "to run concurrently, and 84 months of incarceration on the possessing and brandishing a firearm during a crime of violence charge, to run consecutively to the other two counts." *Id.*; *see also* Add. to PSR at 1 (amending Count 11); *see supra* Part I(B)(1). Additionally, "[a] term of three years of supervised release was imposed on each count, to run concurrently." PSR ¶ 33.

On May 24, 2017, Defendant was also arrested and charged with robbery in the first degree and criminal possession of a firearm under the name "Sharop Lipvro" in connection with the above-mentioned federal conviction. *Id.* ¶ 40. It is presumed "this local prosecution was likely dismissed." *Id.*

On October 1, 2024, Defendant was arrested and charged with criminal possession of a weapon in the second degree, tampering with evidence, criminal possession of a firearm, and criminal possession of a weapon in the fourth degree. *See id.* ¶ 41. Further records regarding the disposition of this charge were not provided to the Court, *see id.*, but Probation indicates the charges reflected in this arrest are "the same charges for which he was charged and prosecuted . . . in the instant federal prosecution[.]" Add to PSR at 6.

### 4.        *Physical and Mental Health*

Defendant has experienced various physical ailments while in the custody at the Bureau of Prisons (the "BOP"). In 2019, "[Defendant]'s appendix burst . . . while he was incarcerated for his prior federal conviction." PSR ¶ 51. "His appendix was subsequently removed, and he needed to stay at The Brooklyn Hospital Center for three days to recover." *Id.* Defendant advised "he has no residual effects" from this medical event. *Id.*

In April 2025, while incarcerated for the instant offense, Defendant broke his right foot playing basketball. *See id.* ¶ 52. Two months later, he was transported to The Brooklyn Hospital Center and "diagnosed with a closed fracture of the base of the fifth metatarsal bone with delayed healing and internal fixation, cicatrix (scar), and gastrocnemius equinus of the right lower extremity (gastrocnemius muscle in the calf is too tight, which limits upward movement of the ankle). *Id.* "[Defendant] was placed in a cast until October 2025[,]" and "commenced physical therapy on January 16, 2026." *Id.*

"[O]n November 24, 2025, [Defendant] was involved in an altercation with another inmate that caused BOP staff to utilize oleoresin capsicum (OC) to stop the fight." *Id.* ¶ 53. "Aside from the exposure to the OC . . . [he] had no other injuries" from the altercation. *Id.*

Defendant reports "he was diagnosed by an unrecalled doctor with attention-deficit/hyperactivity disorder[,]" or ADHD, at "approximately 10 years of age." *Id.* ¶ 55. "He advised that he was prescribed medication for this condition, but he only took it once" because it made him feel drowsy. *Id.* "He attended counseling after his diagnosis[]" "for 'a couple of years' and has not had any other mental or emotional treatment since." *Id.* "Although never formally diagnosed, [Defendant] advised that he is experiencing depression and anxiety." *Id.* ¶ 57. Defendant's prior federal presentence investigation report noted his belief he has bipolar disorder, although he has not been formally diagnosed. *Id.* ¶ 58.

Defendant reports a history of gambling. *See id.* ¶ 56. He began gambling at "approximately 14 years of age," and "[h]is gambling . . . progressed to wagering on sporting events . . . using telephone applications." *Id.* "[T]he last time he gambled on sporting events was in January 2026 while he was incarcerated for the instant offense." *Id.* Although "his

11

gambling caused him to be in debt in the past, . . . he is currently not in debt." *Id.* "[Defendant] never sought gambling treatment, as he feels he can stop gambling at any time." *Id.*

In addition to the above, the Court has considered the mitigation report prepared by Ms. Orloff, which addresses Defendant's mental and emotional disabilities, among other details. *See* Def.'s Ex. B.

### 5.    *Substance Abuse*

Defendant began using marijuana when he was 13 years of age and continued to use it until his arrest "for the instant offense on October 1, 2024[.]" PSR ¶ 60. At approximately thirteen years of age, "[Defendant] stated that he attended an outpatient substance use treatment program in Brooklyn, New York," for six months "as mandated as part of [his] juvenile adjudication" in 2011. *Id.* ¶ 63 (citing ¶ 31); *see supra* Part III(A)(3). "[H]e ceased using marijuana while attending this treatment program but immediately resumed . . . after he completed the program, as he lacked self-control." PSR ¶ 63.

Defendant reports consuming alcohol starting at approximately sixteen years of age. *Id.* ¶ 61. He purportedly "drank about two bottles of liquor per day until he was arrested for the instant offense[.]" *Id.*

### B. The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]" 18 U.S.C. § 3553(a)(2).

12

The Court's sentence recognizes the seriousness of Defendant's conduct. "Instead of serving the remainder of his sentence at the [RRM], he chose to abscond and continued to evade law enforcement for approximately ten months." Gov't Sent'g Mem. at 9, ECF No 75. "When [Defendant] realized that he was about to be arrested for escaping federal custody, . . . he decided to hide a loaded firearm by throwing it out of a thirteenth-story window[,]" which "was incredibly reckless given that the firearm could have fired when it hit the ground, could have hit someone as it fell, or could have been picked up by any member of the public[,]" including children. *Id.*

The Court's sentence will deter Defendant and others from engaging in similar conduct, justly punish Defendant for his crimes, and protect the public from Defendant's actions. Accordingly, the Court's sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in this factor. 18 U.S.C. § 3553(a)(2).

## C. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

Defendant pled guilty to one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). *See* Plea ¶ 1. Defendant faces a maximum term of fifteen years' incarceration and no minimum term. 18 U.S.C. § 924(a)(8).

Defendant also faces a maximum term of three years of supervised release and no minimum term. 18 U.S.C. §§ 924(a)(8), 3583(b)(2). If a condition of release is violated, Defendant may be sentenced up to two years of incarceration without credit for pre-release incarceration or time previously served on post-release supervision. 18 U.S.C. § 3583(e).

13

Defendant is eligible for a term of probation of one to five years. 18 U.S.C. § 3561(c)(1). Unless extraordinary circumstances exist, the Court would have to impose one of the following as a condition of probation: a fine, restitution, or period of community service. 18 U.S.C. § 3563(a)(2).

In addition to facing terms of incarceration, supervised release, and probation, Defendant faces a maximum fine of $250,000.00. 18 U.S.C. § 3571(b).

**D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offense**

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . [t]he applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" 18 U.S.C. § 3553(a)(4)(A).

Pursuant to the U.S. Sentencing Guidelines (the "Sentencing Guidelines," or "Guidelines," or "U.S.S.G."), the Government and Defendant stipulated to a Total Adjusted Offense Level of 21 in the Plea. *See* Plea ¶ 3.

*1.       Base Offense Levels*

*i.       Conviction pursuant to Count Two*

The applicable Guidelines provision is § 2K2.1, which covers, *inter alia*, the possession of firearms and ammunition by felons. *See* U.S.S.G. § 2K2.1. Under § 2K2.1(a), the Base Offense Level for a conviction pursuant to 18 U.S.C. § 922(g)(1) is 20 when the offense was "subsequent to sustaining one felony conviction of . . . a crime of violence[.]" U.S.S.G. § 2K2.1(a)(4)(A); Add. to PSR at 1 (noting Defendant's prior conviction for Hobbs Act robbery); Gov't Sent'g Mem. at 5.

The parties have varying opinions on whether an adjustment should apply to this Base Offense Level pursuant to the Guidelines, resulting in different Subtotal Adjusted Offense Levels

14

for Count Two. The Government asserts U.S.S.G. § 2K2.1(b)(7)(B) adds 4 levels "because [Defendant] used or possessed [a] firearm or ammunition in connection with another felony offense." Gov't Sent'g Mem. at 5–6 (citing Gov't Obj. to PSR at 2, ECF No. 71) (internal quotation marks omitted). "Specifically, [Defendant allegedly] possessed the firearm 'in connection with' . . . his escape and his attempt to obstruct justice." *Id.* at 6.

The Probation and Defendant disagree, first arguing the Government has failed to meet its burden by a preponderance of the evidence establishing Defendant possessed a firearm to facilitate his escape. Add. to PSR at 2; *see* Def.'s Sent'g Mem at 2–4, ECF No. 72; *see* Def.'s First Sent'g Mem. Supp. ("Def.'s First Supp.") at 1–2, ECF No. 76. Second, Probation and Defendant cast doubt upon "[t]he Government's alternative argument[] that [Defendant] possessed the firearm in connection with felony obstruction or evidence tampering[.]" Add. to PSR at 3; *see* Def.'s Sent'g Mem. at 4–5; *see* Def.'s First Supp. at 2–3.

Probation argues for a Subtotal Adjusted Offense Level of 20 for Count Two, while the Government argues for a Subtotal Adjusted Offense Level of 24. Add. to PSR at 4; Gov't Sent'g Mem. at 5. Defendant did not provide a Guidelines calculation separate from objecting to the enhancement. *See generally* Def.'s Sent'g Mem.

### ii.    Stipulated Offense Conduct

Defendant admitted to "escap[ing] from home confinement while in the custody of a residential reentry center in Brooklyn, New York, in violation of 18 U.S.C. § 751(a)." PSR ¶ 2 (citing Plea ¶ 2). The Plea provides this conduct "shall be considered by the Court pursuant to U.S.S.G. § 1B1.2(c) as if the defendant had been convicted of additional count(s) charging those offenses." Plea ¶ 2 (quotation marks omitted).

The applicable Guidelines provision for the stipulated offense conduct is § 2P1.1, which covers, *inter alia*, escape from custody. U.S.S.G. § 2P1.1. Under § 2P1.1(a), the Base Offense Level for the stipulated conduct is 13 when "the custody or confinement is by virtue of an arrest on a charge of felony, or conviction of any offense." U.S.S.G. § 2P1.1(a)(1); PSR ¶ 17; Gov't Sent'g Mem. at 5.

Probation initially asserted a four-level reduction applied to this Base Offense Level pursuant to the Guidelines because "[Defendant] was in the custody of the RRM, which is considered a 'halfway house,' when he escaped from custody." PSR ¶ 18 (citing U.S.S.G. § 2P1.1(b)(3)). However, Probation now agrees with the Government this reduction does not apply "because [Defendant], while away from the facility, committed [a] federal, state, or local offense punishable by a term of imprisonment of one year or more." Add. to PSR at 3 (citing Gov't Obj. to PSR at 4). Therefore, Probation and the Government argue for a Subtotal Adjusted Offense Level of 13 for the stipulated offense conduct. *Id.*; Gov't Sent'g Mem. at 5.

Defendant acknowledges the Government's objection to this mitigating factor but did not provide his position on the issue. *See* Def.'s Sent'g Mem. at 2.

> 2.    *Multiple Count Analysis for the Combined and Total Adjusted Offense Levels*

The applicable Guidelines provision is § 3D1.2, which provides rules for grouping closely related offenses. *See* U.S.S.G. § 3D1.2. Pursuant to U.S.S.G. § 3D1.2, Count Two of the indictment and the stipulated offense "are not grouped" because "they involve separate harms and one of the counts does not embody conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." PSR ¶ 10 (citing U.S.S.G. § 3D1.2).

16

To calculate Defendant's Combined Offense Level, U.S.S.G. § 3D1.4 instructs the Court to assign "[o]ne unit . . . [to] the group with the highest offense level[]" and "[o]ne-half unit . . . [to] any group that is five to eight levels less serious than the highest offense level." Add. to PSR at 4 (citing U.S.S.G. § 3D1.4(a)–(b)) (amending PSR ¶ 23). Because Probation asserts the Subtotal Adjusted Offense Level for the stipulated offense conduct is 13—which is 7 levels "less serious than" the Subtotal Adjusted Offense Level of 20 for Count Two—Probation states the total number of units for the offenses charged is 1.5. *Id.*

Because the Government argued for a Subtotal Adjusted Offense Level of 24 for Count Two, the Subtotal Adjusted Offense Level of 13 for the stipulated offense conduct is 11 levels "less serious than the Group with the highest offense level[,]" and thus U.S.S.G. § 3D1.4(b) does not call for assigning one-half unit to the group. U.S.S.G. § 3D1.3(b)–(c); Gov't Sent'g Mem. at 5–7. The Government states the total number of units for the offenses charges is 1.0. Gov't Sent'g Mem. at 5.

Because Probation and the Government differ as to the total number of units for the offenses charged, they arrive at different Combined Offense Levels. Pursuant to the table at U.S.S.G. § 3D1.4, a total of 1.5 units entitles Defendant to a one-level adjustment, which is applied to the Subtotal Adjusted Offense Level "applicable to the Group with the highest offense level[.]" U.S.S.G. § 3D1.4. Meanwhile, a total of 1.0 units would not result in an adjustment to the Subtotal Adjusted Offense Level. *See id.*

Given these parameters, Probation adds 1 level to the Subtotal Adjusted Offense Level of 20, which results in a Combined Offense Level of 21. Add. To PSR at 4. The Government does not apply an additional adjustment in its calculation, which results in a Combined Offense Level

17

of 24. Gov't Sent'g Mem. at 5. Defendant does not provide a Guidelines calculation as to his Combined Offense Level in his sentencing memorandum. *See generally* Def.'s Sent'g Mem.

The parties agree a mitigating factor should apply to the Combined Offense Level pursuant to the Guidelines. Probation and the Government agree a three-level reduction should apply for Defendant's timely acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b). U.S.S.G. § 3E1.1(a)–(b); PSR ¶¶ 28–29; Gov't Sent'g Mem. at 5. Defendant did not provide a Guidelines calculation in his sentencing memorandum but states "[he] accepts responsibility for his crimes and, in fact, did so the same day that he was arrested." Def.'s Sent'g Mem. at 1.

Therefore, Probation arrives at a Total Adjusted Offense Level of 18, Add. to PSR at 5, while the Government arrives at a Total Adjusted Offense Level of 21. Gov't Sent'g Mem. at 5.

**E. Pertinent Policy Statement(s) of the Sentencing Commission**

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5). In his sentencing memorandum, Defendant has directed the Court's attention to the now-repealed U.S.S.G. § 5H1.1. Def.'s Sent'g Mem. at 10–11. U.S.S.G. § 5H1.1, which was removed effective November 1, 2025, provided as follows:

> A downward departure [] may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals are also more amenable to rehabilitation.
>
> . . .

18

> Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing.

U.S.S.G. § 5H1.1 (repealed Nov.1, 2025).

The Sentencing Commission's prior position has been repealed and is no longer law, but "judges who would have relied upon facts previously identified as a basis for a departure would continue to have authority to rely upon such facts to impose a sentence outside the applicable guidelines range as a variance under 18 U.S.C. § 3553(a)." U.S.S.G Ch.1, Pt.A, intro. comment (Nov. 2025)).

Finding no other pertinent policy statements on its own, the Court proceeds to the next § 3553(a) factor.

## F. The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6).

Defendant addresses the need to avoid unwarranted sentences by citing "[d]ata from the United States Sentencing Commission's Judiciary Sentencing Information (JSIN) database" to argue "that courts routinely impose sentences at or below the Guidelines range for defendants in [his] position." Def.'s Sent'g Mem. at 12 (citing JSIN database, www.ussc.gov (last accessed June 10, 2026)). Specifically, Defendant states between 2021 and 2025, 752 defendants "whose primary guideline was section 2K2.1, with a Final Offense Level of 17 and a Criminal History Category of II," had "an average length of imprisonment" of "25 months and [a] median [of] 27 months." *Id.* at 12–13.

19

The Government disagrees, arguing the data "only tells part of the story." Gov't Sent'g Mem. at 11. Namely, the Government believes "[t]his data cannot account for the fact that [Defendant] was on escape status when he committed the instant offense, that he attempted to obstruct justice by throwing a loaded firearm from the thirteenth floor of a residential building, or that he has a serious history of firearms possession." *Id.* Therefore, according to the Government, "[t]he Court should consider these aggravating factors when imposing sentence." *Id.* The Court agrees with the Government.

The Court has reviewed and considered carefully the parties' arguments. For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

### G. The Need to Provide Restitution

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

Restitution is not applicable in this case because "[t]here [is] no identifiable victim[.]" PSR ¶ 6; *see also* U.S.S.G. § 5E1.1(a).

### IV.    Conclusion

For the reasons set forth above, the Court sentences Defendant to forty-one (41) months' incarceration; two (2) years of supervised release with both the standard and special conditions of supervision; forfeiture of the Seized Firearm and Ammunition as identified in the preliminary Order of Forfeiture, issued on July 11, 2025; and a $100.00 mandatory special assessment. This sentence is sufficient, but not greater than necessary, to accomplish the purposes of § 3553(a). The Court does not impose a fine given Defendant's present financial circumstances.

20

The Court expressly adopts the factual findings of the PSR and addenda thereto, as corrected herein, to the extent those findings are not inconsistent with this opinion. The Court advises Defendant he has fourteen (14) days to appeal the order and judgment of this court from the date the order and judgment are entered.

SO ORDERED.

**s/WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: July 20, 2026
      Brooklyn, New York